UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDRE ADAMS,<br><br>                    Plaintiff,<br><br>    — against —<br><br>PATRICK QUIGLEY, CRAIG LUPARDO,<br>DANIEL DELPINO, and THE CITY OF NEW<br>YORK.<br><br>                    Defendants. | Case No. 19-CV-1662<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Andre Adams ("Plaintiff" or "Mr. Adams") files this action against Defendants Patrick Quigley, Craig Lupardo, and Daniel Delpino (the "Individual Defendants"), each in his individual capacity; and the City of New York; and alleges as follows:

**NATURE OF THE ACTION**

1.      Mr. Adams brings this action under 42 U.S.C. § 1983 to recover damages relating to his false arrest, malicious prosecution, and denial of a fair judicial process.

2.      In March 2018, the Individual Defendants arrested Plaintiff without probable cause during a "broken windows" policing-style sweep in a New York City Housing Authority ("NYCHA") apartment.

3.      The Individual Defendants fabricated evidence against Mr. Adams, including sworn allegations that Defendant Quigley "observed [Mr. Adams] drop a lit [marijuana] cigarette from his hand." The supposed marijuana cigarette that Mr. Quigley allegedly "observed" Mr. Adams drop "from his hand" was never recovered, because it did not exist.

4.      After the Individual Defendants arrested Mr. Adams, Defendant Delpino forcefully walked Mr. Adams down a staircase while his hands were cuffed behind his back. As

the two men descended the stairs, Defendant Delpino intentionally, unreasonably, and without

justification caused Mr. Adams to fall down the stairs, resulting in physical injury to Mr. Adams.

5.      As he fell down the staircase, Mr. Adams' falling body made contact with

Defendant Delpino, causing Mr. Delpino to fall along with Mr. Adams.

6.      Video recordings of the fall exist and are in the parties' possession.

7.      Defendant Delpino did not suffer injury.  He immediately stood up and

continued to walk the visibly injured Mr. Adams down the stairs.  Other police officers walked

past Defendant Delpino as he was on the ground and as he stood back up, glancing at him but not

stopping because they could see he was not injured.

8.      Rather than apologize, the officers used this incident to falsely accuse Mr.

Adams of assaulting a police officer and threaten him with a felony conviction and years in

prison.

9.      For more than six months, the individual Defendants and others falsely

stated and swore that Mr. Adams had thrown himself down the stairs at the officers in an attempt

to injure them.  They maintained those false claims in documents given to prosecutors that led to

Mr. Adams's prosecution.

10.     Only when Mr. Adams's criminal defense attorney obtained video footage

during the course of the criminal prosecution was the case dropped and Mr. Adams's liberty

restored.

11.     The video evidence demonstrates that Mr. Adams was innocent of the

charges leveled against him and that the officers had lied in order to further his prosecution and

protect themselves from a false arrest and excessive force suit.  This suit now follows.

## JURISDICTION AND VENUE

12.     This action arises under 42 U.S.C. §§ 1983 and 1988.

13.     Jurisdiction lies in this Court under its federal question and civil rights jurisdiction, 28 U.S.C. §§ 1331 and 1343.

14.     Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff's claims arose within the Eastern District of New York.

## PARTIES

15.     Plaintiff Andre Adams is a resident of Staten Island, New York and a citizen of the United States.

16.     Defendant Patrick Quigley is a Sergeant in the New York City Police Department, who at all relevant times acted under color of state law, and who is sued in his individual capacity.

17.     Defendant Daniel Delpino is an officer in the New York City Police Department, who at all relevant times acted under color of state law, and who is sued in his individual capacity.

18.     Defendant Craig Lupardo is an officer in the New York City Police Department, who at all relevant times acted under color of state law, and who is sued in his individual capacity.

19.     Defendant City of New York is a municipal corporation existing under the laws of the State of New York.

## GENERAL ALLEGATIONS

20.     On March 22, 2018, Plaintiff Andre Adams was sitting inside the doorway of his friend's apartment with the door open.  The friend is referred to herein as "Individual 1." Mr. Adams and Individual 1 were on the second floor of a NYCHA apartment building in Staten Island.

21.     Individual 1's door was open so that Mr. Adams could hear his 94-year-old grandmother, who lived across the hall.  Mr. Adams helps care for his grandmother, who was responsible for raising him.

22.     Mr. Adams and Individual 1 were watching boxing videos of their friend, a professional boxer with whom they had grown up on Staten Island.

23.     As they watched boxing videos, "Individual 2" – Individual 1's brother – came up the stairwell, entered the hallway, and joined Mr. Adams.

24.     Soon thereafter, three police officers – Patrick Quigley, Craig Lupardo, and Daniel Delpino – entered the hallway and threw Individual 2 against the wall and began to arrest him.

25.     Mr. Adams and Individual 2 verbally protested the unnecessary use of force, and Mr. Adams's brother, who was across the hall in their grandmother's apartment, also came out to see what the commotion was about.

26.     None of these young men approached the officers or attempted to interfere with them in any way.

27.     The Defendant police officers, angered that these young, African-American men dared to question their actions, arrested Mr. Adams and his brother.

28.     The Defendant police officers pushed Mr. Adams against a wall and cuffed his hands behind his back.

29.     Mr. Adams asked the officers why they were arresting him.  The officers did not answer.

30.     In their files, the police officers in fact note that Mr. Adams consistently asked them "for what, for what" when they arrested him.

31.     Defendant Quigley threatened Mr. Adams, who was still asking why he was getting arrested, saying to Mr. Adams, "are you trying to go down those stairs?"  Defendant Quigley was implying that Mr. Adams would be thrown down the stairs if he did not stop verbally protesting and questioning the police officers' actions.

32.     The officers then took Mr. Adams and two others down the stairwell towards their vehicles, where other officers had already arrived.

33.     While walking down the stairs, Defendant Delpino yanked on Mr. Adams' arm, causing him to fall down the stairs, on top of Mr. Delpino, and injuring Mr. Adams.

34.     After the fall, Defendant Delpino pulled Mr. Adams up and continued pushing him down the stairwell.

35.     Mr. Adams requested medical attention after the fall but was refused.

36.     Officer Delpino was not injured by the fall, but later claimed to be injured.

37.     At the precinct, various officers, including supervisors, tried to coerce Mr. Adams into saying that he was not injured by the fall.  Officers told Mr. Adams that if he did not deny being injured, he would be charged with assaulting a police officer, a felony.

38.     Mr. Adams initially refused, but after officers told him that he would be released if he agreed to state on video that he was uninjured, Mr. Adams agreed to their demand. A police officer used a cell phone to record a statement by Mr. Adams.

39.     After Mr. Adams made the recorded statement, rather than release him, officers locked him back in a holding cell.

40.     After a shift change, Mr. Adams informed a different group of officers of his injuries.  One or more of those officers brought Mr. Adams to the hospital where he was treated for his injuries.

41.     Mr. Adams and Individual 2, who were arrested along with Mr. Adams, were released from the precinct with summonses.

42.     Mr. Adams was held in custody based on the false charges leveled by the individual Defendants.  Because of a weekend, Mr. Adams was jailed for approximately three days before he was brought to court and arraigned.

43.     Mr. Adams was charged with a litany of crimes he did not commit.

44.     Defendant Lupardo swore out a felony complaint that included numerous false statements.  The complaint incorporated by reference false statements made by Defendants Quigley and Delpino.

45.     Defendants Delpino and Lupardo falsely swore that Mr. Adams "intentionally lunged his body down the stairs, causing [Delpino] to fall down the stairs, and experience physical injury including but not limited to sprained left knee, sprained right shoulder, strained back, substantial pain, and redness and swelling to [Delpino]'s knee, back, arm, and hip, and a contusion to [Delpino]'s hip."

46.     Based on those false statements, Mr. Adams was charged with assault in the second degree (assault on a police officer), a Class D Felony.  That charge subjected Mr. Adams to years of imprisonment.

47.     Mr. Adams was also charged with assault in the third degree, resisting arrest, and obstructing governmental administration in the second degree; based on the same false statements by Defendants Delpino and Lupardo.

48.     Defendants Quigley and Lupardo falsely swore that Mr. Adams possessed a lit marijuana cigarette, and that Defendant Quigley watched Mr. Adams drop the supposed marijuana cigarette from his hand.  The alleged marijuana was a fabrication; it never existed.

49.     The judge in Mr. Adams' criminal case set bail at $20,000, resulting in Mr. Adams' continued incarceration.

50.     Mr. Adams was later released on bail.

51.     For the next approximately nine months, Mr. Adams had his liberty restricted by the conditions of his bail, he was required to appear in court approximately ten times, and he was forced to live in fear of going to prison for many years despite having committed no crime.

52.     After the parties to the criminal case obtained a video from the stairwell depicting part of the alleged "assault," and in light of the non-existence of the alleged marijuana, prosecutors moved to dismiss the case after a single adjournment, unconditionally, and with the provision that the case to be sealed immediately.  The state court agreed, adjourning and then dismissing the case.

## FIRST CAUSE OF ACTION

DENIAL OF DUE PROCESS AND A FAIR TRIAL
UNDER THE FIFTH AND FOURTEENTH AMENDMENTS
AND 42 U.S.C. SECTION 1983

(Against Defendants Quigley, Delpino, and Lupardo)

53.     Plaintiff repeats and realleges each and every allegation set forth above.

54.     The Fifth and Fourteenth Amendments guarantee that every person who is subject to criminal charges has the rights to a fair trial, to timely disclosure of favorable information (*i.e.*, *Brady* and *Giglio* information), and not to have false or fabricated evidence presented against the accused.

55.     Together and individually, the individual Defendants forwarded false information and fabricated evidence to prosecutors.

56.     Defendants Lupardo and Quigley falsely stated, including in police reports and charging documents, that Mr. Adams possessed marijuana and that Defendant Quigley "observed [Mr. Adams] drop a lit [marijuana] cigarette from his hand."

57.     Defendant Lupardo and Delpino falsely stated, including in police reports and charging documents, that Mr. Adams "intentionally lunged his body down the stairs, causing [Defendant Delpino] to fall down the stairs, and experience physical injury."

58.     These Defendants knew, or were deliberately indifferent to the fact, that the false information and fabricated evidence they created and communicated to prosecutors were likely to cause the initiation and continuation of criminal proceedings against Mr. Adams, and likely to influence a jury verdict.

59.     Defendants withheld from prosecutors and from the defense material information favorable to the defense – the disclosure of which was required under *Brady v. Maryland*, *Giglio v. United States*, and their progeny – including, but not limited to, their knowledge that Mr. Adams did not possess marijuana and did not assault or attempt to assault a police officer.

60.     The non-disclosure of *Brady* and *Giglio* information directly and proximately caused the initiation and continuation of criminal process against Mr. Adams.

61.     When some of the *Brady* and *Giglio* information came to light, prosecutors terminated the criminal proceedings against Mr. Adams.

62.      As a direct and proximate result of Defendants' acts and omissions, the Defendants deprived the Plaintiff of his liberty and property.

## SECOND CAUSE OF ACTION

### FALSE ARREST AND MALICIOUS PROSECUTION
UNDER THE FOURTH AND FOURTEENTH AMENDMENTS
AND 42 U.S.C. SECTION 1983

(Against Defendants Quigley, Delpino, and Lupardo)

63.     Plaintiff repeats and re-alleges each and every allegation set forth above.

64.     Acting individually and in concert, the individual Defendants deprived Mr. Adams of his rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable searches and seizures, and to his liberty, by detaining, searching, arresting, confining, causing the confinement, and/or continuing the confinement of Mr. Adams without any privilege to do so.

65.     Probable cause did not exist either to arrest or prosecute Mr. Adams; his arrest and prosecution were, rather, based on Defendants' false allegations – including the false allegation that Mr. Adams possessed marijuana and the false allegation that Mr. Adams assaulted or attempted to assault a police officer.

66.     Plaintiff was conscious of his confinement and did not consent to it.

67.     Defendants acted with actual malice.

68.     The criminal proceedings terminated in Mr. Adams' favor

## THIRD CAUSE OF ACTION

### MUNICIPAL LIABILITY FOR DENIAL OF DUE PROCESS AND A FAIR TRIAL
UNDER THE FIFTH AND FOURTEENTH AMENDMENTS
AND 42 U.S.C. SECTION 1983

(Against the City of New York)

69.     Plaintiff repeats and realleges each and every allegation set forth above.

70.     Defendant the City of New York maintains a custom and policy of failing to discipline police officers who provide false testimony in sworn charging documents, which caused Mr. Adams to suffer the loss of liberty described in this Complaint.

71.     Prior to Mr. Adams' arrest, policymaking officials at the New York City Police Department ("NYPD") – acting with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity; to the risk of arresting, prosecuting, and convicting innocent people; and to the rights of all criminal suspects and defendants to due process and a fair trial – implemented patently inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

    a.    False statements and testimony by police officers;

    b.    The duty of police officers not to fabricate evidence against criminal defendants or suspects; and

    c.    The continuing duty of police officers to preserve and to make timely disclosure to prosecutors, during criminal investigations and prosecutions, of all material evidence or information (*i.e.*, *Brady* and *Giglio* material) favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to: evidence of innocence; and evidence that a police or prosecution witness made false statements, is unreliable, or lacks credibility.

72.     The aforesaid deliberate or *de facto* policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

    a.    To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.    That such issues either present police employees with difficult choices of the sort that instruction,

training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c.      That the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

73.     The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

a.      credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony;

b.      civil lawsuits, some of which resulted in substantial verdicts, judgments, or settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or made false statements in reports and testimony;

c.      numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady*;

d.      judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see, e.g., Cordero v. City of New York*, 282 F. Supp. 3d 549, 554 & n.1 (E.D.N.Y. *Carter v. Harrison,* 612 F. Supp. 749 (E.D.N.Y. 1985), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under under *Brady, see Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992);

e.  formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the New York City Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

f.  numerous reports of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission") and subsequent commissions, finding that the NYPD failed to take sufficient steps to deter and correct perjury and falsification of evidence by police officers;

74.  In June 2018, NYPD Commissioner James P. O'Neill appointed an independent panel (the "White Panel") to conduct a review of the NYPD's internal discipline system.  The panel consists of the Honorable Mary Jo White, its chair; the Honorable Robert L. Capers; and the Honorable Barbara S. Jones.

75.  That panel found that the NYPD's internal processes encourage and condone false statements.

76.  While patrol guide § 203-08 requires dismissal for making an intentional false statement, officers are almost never charged under this section and are instead charged under provisions used to avoid punishing dishonesty.

77.  Even where officers were found to have violated § 203-08, the Department's trial commissioners recommended punishments that allowed officers to remain employed despite the presumptive dismissal penalty.

78.  The City's Commission to Combat Police Corruption has recommended that the NYPD charge under §203-08, but the Department refuses to do so.

79.  The White Panel noted that the practice of "handing off" arrests for administrative convenience leads to false testimony from officers, who claim to have witnessed all facts in a case, when in fact, they did not.  This practice allows certain officers to earn

overtime, but according to police supervisors, tolerating "this practice…promotes a culture in which more egregious falsehoods occur."

80.     Prosecutors in the five New York City District Attorneys' offices make coordinated efforts to protect officers they know to be frequent fabricators.  In one instance in Staten Island, for example, an assistant district attorney dismissed a case in order not to "burn" one of the police officers by revealing his false statements.  No case was brought against that officer for perjury.

81.     The practice of "testilying" has become so ingrained in the NYPD that it spawned that neologism.  There are never consequences for those officers.  The New York Times reported on a similar instance in the Bronx, where officers lied about a search that happened in a New York City, claiming that they moved a laundry bag in a hallway and felt a heavy thud inside it as they moved it.  That never happened.  When video disproving the incident was found, the case was dropped, but the police officers were not charged for their perjury.  The *New York Times* reviewed 25 other cases with similar "testilying" issues.[1]

82.     Another recent case seeks to make public a list of officers that the Manhattan District Attorney knows to be untruthful and therefore refuses to put on the stand.  Those officers are not punished, however; they are merely not allowed to be used in court.[2]

83.     This case arises from the same pattern and practice.  The prosecutor in Mr. Adams' case dismissed the case upon learning that the officers had been caught on camera lying about what had occurred with Mr. Adams.  The prosecutor, however, did not initiate charges against those officers for their perjured testimony.

---

1.   *https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html*.

2.   *https://www.law.com/newyorklawjournal/2018/10/23/suit-alleges-manhattan-da-is-hiding-list-of-police-officers-with-compromised-credibility.*

84. The culture of testilying created by the failure to discipline officers for their false testimony has caused NYPD officers throughout the city to make up events and charges.

85. Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (and/or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing truthful statements and testimony, and the disclosure of *Brady* and *Giglio* material.

86. The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

87. During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

88. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiffs rights under the Constitution and laws of the United States.

89.     By virtue of the foregoing, Defendant City of New York is liable for

having substantially caused the foregoing violations of Plaintiffs constitutional rights and his

constitutional injuries.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.     For compensatory damages in an amount to be determined at trial, but in

all events no less than $500,000;

b.     For punitive damages against the individual Defendants;

c.     For costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. §

1988 and to the inherent powers of this Court;

d.     For pre- and post-judgment interest as allowed by law; and

e.     For such other and further relief as this Court deems just and proper.

Dated:  March 22, 2019
        New York, New York

                        DAVID B. SHANIES LAW OFFICE


                By: _____
                        David B. Shanies
                        Joel A. Wertheimer
                        411 Lafayette Street, Sixth Floor
                        New York, New York 10003
                        (212) 951-1710 (Tel)
                        (212) 951-1350 (Fax)
                        *david@shanieslaw.com*
                        *joel@shanieslaw.com*

                        *Counsel for Plaintiff Andre Adams*